**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARIO DIAZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 C 5621 |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| AVERY HART, EILEEN COUTURE, ) | |
| Dr. SIMS, MICHAEL PUISIS, PARTHA ) | |
| GHOSH, ARTHUR FUNK, THOMAS DART, ) | |
| TERRY MCCANN, JORGE PRIETO, and ) | |
| RICHARD KEEN, in their individual and ) | |
| official capacities, and ROGER WALKER, in ) | |
| his official capacity, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Mario Diaz filed a third amended complaint against Avery Hart, Eileen Couture, Kevin Sims,[1] Michael Puisis, Partha Ghosh, Arthur Funk, Thomas Dart, Terry McCann, Jorge Prieto, and Richard Keen (collectively but excluding Prieto,[2] "defendants") in their individual and official capacities and against Roger Walker[3] solely in his official capacity under 42 U.S.C § 1983 for deprivation of due process under the Fourteenth Amendment.[4] The complaint arises from defendants' alleged deliberate indifference to Diaz's request for clavicle surgery while imprisoned. Before the court are defendants' motions to dismiss under Federal Rule of Civil

---

[1] Kevin Sims, a physician's assistant, was incorrectly named as "Dr. Sims" in Diaz's complaint. Defs. Dart, Hart, Couture, Keen and Sims's Mot. at 1 n.1.
[2] Although Jorge Prieto's name appears in the docket entries (Docket No. 77, 87, 92), he has not joined in seeking dismissal of the complaint. While an attorney is listed as representing Prieto on the docket, no attorney appearance form has been docketed. A summons was returned executed for Prieto (Docket No. 66) on June 1, 2009.
[3] A summons was issued as to Walker (Docket No. 14), but the docket does not contain an entry indicating that the summons was returned executed.
[4] The court has jurisdiction under 28 U.S.C §§ 1331 and 1343(a)(3). Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because at least one defendant resides in this District and all of the events giving rise to Diaz's claims occurred in this District.

Procedure 12(b)(6).[5] For the following reasons, Dart, Hart, Couture, Keen, and Sims's motion to dismiss [#77] is granted in part and denied in part; Puisis and McCann's motion to dismiss [#79] is granted in part and denied in part; and Ghosh and Funk's motion to dismiss [#81] is denied.

**BACKGROUND**

The following facts are taken from the Third Amended Complaint and are presumed true for the purpose of resolving the pending motions. Diaz, a 51-year-old man, alleges that defendants failed to provide medical treatment for an injury he sustained while detained in the Cook County Jail ("the Jail"). Third Am. Compl. ¶ 17. Avery Hart was the chief medical officer for Cermak Health Services ("Cermak") at the Jail beginning in July 2008. *Id.* ¶ 6. Eileen Couture was the chief medical officer for Cermak from July 2007 until July 2008. *Id.* ¶ 7. Partha Ghosh was the medical director for Stateville Correctional Center ("Stateville") and Northern Reception and Classification Center ("NRC"). *Id.* ¶ 9. Michael Puisis was the medical director for the Illinois Department of Corrections ("IDOC"). *Id.* ¶ 10. Arthur Funk was the Illinois Regional Director for Wexford Health Services ("Wexford"), the medical care contractor for IDOC and was responsible for providing medical care services for detainees at Stateville and NRC. *Id.* ¶ 11. Thomas Dart was the Sheriff of Cook County. *Id.* ¶ 12. Terry McCann was the Warden of Stateville and NRC. *Id.* ¶ 13. Jorge Prieto, a physician, examined Diaz at John H. Stroger Jr. Hospital ("Stroger") and denied his request for surgery. *Id.* ¶ 14. Richard Keen was the head of surgery at Stroger. *Id.* ¶ 15. Kevin Sims worked as a physician's assistant at the Jail and had authority to prescribe medication for detainees. *Id.* ¶ 8. Diaz alleges that all the above-mentioned defendants, except Sims, could have authorized surgery but did not. *Id.* ¶¶ 6-15.

---

[5] Unlike the other defendants, Keen only seeks dismissal of the claims brought against him in his official capacity. *See* Defs. Dart, Hart, Couture, Keen and Sims's Mot. at 10.

In October 2007, Diaz stepped into a pothole at the Jail, fell to the ground, and was injured. *Id.* ¶ 21. Diaz was sent to Cermak. *Id.* ¶ 22. There, a physician's assistant (not a defendant) told Diaz that his collarbone was dislocated, unsuccessfully attempted to move the bone back into place, and sent Diaz back to the Jail without stating whether surgery would be necessary. *Id.* ¶ 23. A few days later, Diaz was sent to NRC,[6] where intake physicians told him "they would see what they could do" about his shoulder. *Id.* ¶ 24. From October 2007 to August 2008 as he was transferred between the Jail and NRC, Diaz had at least six additional exams in which physicians (not defendants) observed Diaz's collarbone and stated it required surgery. *Id.* ¶ 25.

While at NRC, Diaz repeatedly requested grievance forms to demand surgery, but corrections officers in charge never provided him with the forms. *Id.* ¶ 27. In contrast, while at the Jail, Diaz did have access to grievance forms and filled out at least ten grievances between January and June 2008. *Id.* ¶ 28. Six months after filing his initial grievance, Diaz received a response to all his grievances, stating that the issue would be referred to Cermak. *Id.* ¶ 29. On August 21, 2008, Diaz had another intake exam at Cermak where x-rays were taken, and he was yet again informed that surgery was necessary. *Id.* ¶ 31.

No action having been taken, Diaz filed grievances on September 17 and September 23, 2008, requesting surgery and compensation for the pain and suffering he endured. *Id.* ¶ 32. The grievances were referred to the division physician, alleged to be Sims but whom defendants identify as a physician's assistant. *Id.* ¶ 34; Defs. Dart, Hart, Couture, Keen and Sims's Mot. at 1 n.1. Diaz was sent to Stroger on November 3 and again on November 17, 2008. *Id.* ¶ 36. While at Stroger, Diaz was given an appointment to return for surgery, but the appointment was

---

[6] NRC is alleged to be a detention center where pre-trial detainees like Diaz, who are serving a parole or probation term when detained, commonly remain to complete their term because it is close to the criminal courthouses in Chicago. Third Am. Compl. ¶ 18.

later canceled. *Id.* ¶¶ 36-37. Diaz filed a grievance asking for information on why the surgery was canceled. *Id.* ¶¶ 38. He did not meet with Sims, however, until January 30, 2009. *Id.* ¶ 40. During this meeting, Sims failed to refill Diaz's prescription for pain medication. *Id.* ¶ 40.

After filing suit, another appointment was made for Diaz at Stroger on April 15, 2009. *Id.* ¶¶ 41-42. At that appointment, Dr. Prieto concluded that Diaz did not need surgery. *Id.* ¶ 42. On May 4, 2009, Diaz met with yet another doctor at Stroger who concluded that Diaz needed surgery. *Id.* ¶ 43. Within fifteen minutes of the examination, however, a nurse told Diaz that Dr. Keen had already concluded that Diaz had "waited too long" to have surgery. *Id.* Consequently, Diaz was sent back to the jail without surgery being scheduled. *Id.* At the time the Third Amended Complaint was filed, Diaz did not have an appointment to see an orthopedist nor a scheduled date for surgery. *Id.* ¶ 44.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). In order to survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of the claim's basis, but must also establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *see also Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

4

**DISCUSSION**

**I. Exhaustion**

Pursuant to the Prisoner Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Pozo* v. *McCaughtney*, 286 F.3d 1022, 1023 (7th Cir. 2002) ("Unless the prisoner completes the administrative process by following the rules the state has established for that process, exhaustion has not occurred."). In *Pavey* v. *Conley*, the Seventh Circuit held that the district court must determine as a threshold matter whether "the prisoner has properly exhausted his administrative remedies." 544 F.3d 739, 742 (7th Cir. 2008). The exhaustion requirement is to allow "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter* v. *Nussle*, 534 U.S. 516, 524-25, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002); *Dole* v. *Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) ("'The sole objective of § 1997e(a) is to permit the prison's administrative process to run its course before litigation begins.'" (quoting *Cannon* v. *Washington*, 418 F.3d 714, 719 (7th Cir. 2005))). Since failure to exhaust is an affirmative defense, prison officials bear the burden of proof. *Jones* v. *Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); *Conyers* v. *Abitz*, 416 F.3d 580, 584 (7th Cir. 2005).

The Seventh Circuit has taken a "strict compliance approach to exhaustion." *Dole*, 438 F.3d at 809. Moreover, no futility exception to the PLRA's exhaustion requirement exists. *See Perez* v. *Wis. Dep't of Corr.*, 182 F.3d 532, 537 (7th Cir. 1999). To comply with the PLRA, a prisoner who wishes to complain about prison conditions must first ensure that all "administrative remedies as are *available* are exhausted." 42 U.S.C. § 1997e(a) (emphasis

5

added). The case law is not settled on how "available" should be defined, but a plaintiff's claims will not be dismissed where "prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole*, 438 F.3d at 809 (citing *Lewis* v. *Washington*, 300 F.3d 829, 833 (7th Cir. 2002)).

### A. Exhaustion at NRC

Ghosh and Funk argue that Diaz failed to initiate or participate in the administrative remedies available to him at NRC. Diaz alleges, however, that he has exhausted all of the administrative remedies available to him as he repeatedly asked for grievance forms while at NRC but was never provided with any. *See* Third Am. Compl. ¶ 27. While not explicitly alleged, the court can reasonably infer from Diaz's repeated requests that his failure to file grievances was due to NRC prison officials' denying him access to the grievance process and not to Diaz's failure to attempt to use internal procedures first. Diaz was thus prejudiced by having the forms withheld from him, and his claims should not be dismissed for this reason. *See Dole*, 438 F.3d at 810-11 (finding exhaustion where a guard took a prisoner's grievance form but did not file it); *Arreola* v. *Choudry*, No. 03 C 2854, 2004 WL 868374, at *2 (N.D. Ill. April 22, 2004) ("[W]hen administrative remedies are effectively made unavailable by the actions of prison officials, the prisoner may file suit without pursuing those unavailable remedies to conclusion.").

### B. Exhaustion at the Jail

Whether Diaz exhausted all administrative remedies at the Jail is a more difficult question. Unlike at NRC, Diaz admits that he did have access to grievance forms at the Jail. *See* Third Am. Compl. ¶ 27. In fact, he filed at least ten grievances in the jail between January and June 2008, demanding surgery to treat his dislocated clavicle. *Id.* ¶ 28. Defendants' argument is

6

that Diaz did not fulfill the initial, informal step of meeting with a counselor regarding his complaint as required by IDOC's grievance procedure. Pursuant to IDOC regulations, "[a]n offender shall first attempt to resolve incidents, problems, or complaints other than complaints concerning disciplinary proceedings through his or her counselor." Ill. Adm. Code tit. 20, § 504.810(a). Exhaustion requires that a "prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require," and Diaz filed formal grievances in the proper time and place. *Pozo*, 286 F.3d at 1025. Defendants have not cited, and the court is unable to find, a precedential case holding that a prisoner must comply with this informal resolution process after administrators have responded to formal grievances in order for exhaustion to be found.[7] "[T]he purpose of the PLRA's exhaustion requirement was to assure that available internal remedies would be utilized, not that judicial remedies would be foreclosed." *Goodman* v. *Carter*, No. 2000 C 948, 2001 WL 755137, at *3 (N.D. Ill. July 2, 2001). Diaz clearly utilized the formal grievance procedure, and no opposition was contemporaneously posed to his not having first consulted with a counselor. Thus, defendants must be treated as having waived the requirement and cannot now interpose it as an objection to Diaz filing suit. *See Am. Home Assurance Co.* v. *Dykema*, 811 F.2d 1077, 1081 n.6 (7th Cir. 1987) (finding that waiver occurred where the acts or words of the defendant insurer induced the plaintiff to reasonably believe that the plaintiff's insurance coverage would be unaffected by the strict terms of the policy.). Therefore, the court finds that Diaz has exhausted his administrative remedies.

---

[7] A court in the Northern District of Florida found that prison staff were correct to reject a plaintiff's formal grievance in the absence of his having first followed an informal grievance procedure. *See Scarborough* v. *Cohen*, No. 4:06 CV 152-RH/WCS, 2007 WL 934594, at *7 (N.D. Fla. March 26, 2007). This differs from Diaz's case in that Diaz's formal grievances were accepted even though he may not have first attempted to resolve his grievances informally with his counselor.

**II. Individual Capacity Claims**

Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment, and those claims are assessed using the same standards for deliberate indifference that the courts use for a detained prisoner's Eighth Amendment claims. *Williams* v. *Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007); *Cavalieri* v. *Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) ("The Eighth Amendment does not apply to pretrial detainees, but as a pretrial detainee, [plaintiff] was entitled to at least the same protection against deliberate indifference to his basic needs as is available to convicted prisoners under the Eighth Amendment."). Deliberate indifference has both objective and subjective aspects; the inmate must have an objectively serious medical condition, and the prison official must be subjectively aware of and consciously disregard the inmate's medical need. *Grieveson* v. *Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) (citing *Wynn* v. *Southward*, 251 F.3d 588, 593 (7th Cir. 2001)).

An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes* v. *Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). Defendants do not contest the objective requirement, conceding that a dislocated clavicle is a serious medical need. *See Higgins* v. *Corr. Med. Servs. of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999) (a dislocated shoulder can cause great pain and be a serious medical need).

To satisfy the subjective prong of deliberate indifference, a plaintiff must allege that the defendants in question were aware of and consciously disregarded the inmate's medical need. *Farmer* v. *Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Additionally, the plaintiff must allege that defendants were *personally involved* in the deprivation of his constitutional rights. *See Kitzman-Kelley* v. *Warner*, 203 F.3d 454, 458 (7th Cir. 2000).

Usually, mere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference. *See Johnson* v. *Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). At least at the pleading stage, though, certain denials of treatment can be so gross to warrant an inference of deliberate indifference. *Duncan* v. *Duckworth*, 644 F.2d 653, 654-55 (7th Cir. 1981) (noting that initial failure to properly diagnose an injury may be mere error in judgment, but the failure to schedule surgery for twenty-two months, after the need was recognized, created an inference of deliberate indifference); *see also Ralston* v. *McGovern*, 167 F.3d 1160 (7th Cir. 1999) ("[T]he civilized minimum [concern for a prisoner's medical need] is a function both of objective need and of cost. The lower the cost, the less need has to be shown, but the need must still be shown to be substantial.").

### A. Kevin Sims

Kevin Sims is the physician's assistant for the Jail division where Diaz was detained. Third Am. Compl. ¶ 34; Defs. Dart, Hart, Couture, Keen and Sims's Mot. at 1 n.1. A social worker notified Diaz on October 9, 2008 that his grievances discussing his dislocated clavicle, dated September 17 and September 23, 2008, were "referred to div. physician." Third Am. Compl. ¶ 34. Diaz alleges that Sims was the physician for his division of the Jail. *Id.* After Diaz's surgery was canceled, he filed an additional complaint on November 24, 2008 requesting surgery. *Id.* ¶¶ 37-39. It is unclear exactly what happened with this November 24 grievance since a social worker checked a box turning it into a request, but since Diaz was still in the same division and it dealt with the same medical issue, it is reasonable to infer that this would also have been referred to Sims. *Id.* ¶ 39; Ex. D to Third Am. Compl. Diaz met with Sims on January 30, 2009. During this appointment, Sims did not refill Diaz's prescription for pain medication nor set a future appointment for Diaz to have surgery on his shoulder. Third Am.

9

Compl. ¶ 40. Although Diaz has not alleged that Sims had the authority to authorize surgeries, he has alleged enough—refusal to authorize medication while knowing that surgery was needed and not setting up another appointment—to create an inference of deliberate indifference at this early stage of the proceedings. Whether Sims, as a physician's assistant, has that authority or at least the ability to convey the need to a physician who has the power to authorize the surgery will require further development, and the court will not deny Diaz the opportunity to pursue this line of inquiry. *See Boatman* v. *Dart*, No. 08 C 3630, 2009 WL 1137753, at *5 (N.D. Ill. Apr. 20, 2009) (denying physician's assistant's motion to dismiss because enough personal involvement was alleged even though question of fact remained as to whether the physician's assistant could prescribe shoes for an inmate or at least convey that information to a doctor).

### B. Hart, Couture, Ghosh, Puisis, and Funk

Under notice pleading, Diaz has sufficiently alleged the personal involvement of Hart, Couture, Ghosh, Puisis, and Funk in their roles as supervisory medical officials. Diaz has alleged that they were the ones who established the policy of denying procedures needed to treat serious medical conditions such as his. *Doyle*, 305 F.3d at 615. In addition, the defendants' titles and positions can lead to an inference that they had some personal responsibility for establishing the medical policies at their respective institutions. *See Doyle*, 305 F.3d at 615 (finding DCFS Deputy Director's position enough to establish inference of personal responsibility for practices and customs, despite a lack of specific acts by the deputy director); *see also Duncan*, 644 F.2d at 655-56 (reversing dismissal of a hospital administrator from a § 1983 claim of deliberate indifference because his position "justifies the inference at this stage of the proceeding that he does bear some responsibility for the alleged misconduct.").

10

Diaz alleges that he was denied procedures needed to treat his serious medical condition at Cermak, where Hart and Couture were the chief medical officers, and that Hart and Couture were involved in establishing a policy of denying such needed procedures. Diaz also alleges he was denied surgery at NRC. Ghosh was the medical director at NRC, Puisis was the medical director for IDOC, which administers NRC, and Funk was the Illinois Regional Director for Wexford, which is the medical care contractor at NRC. Hart, Couture, Ghosh, Puisis, and Funk can all be considered to have had sufficient personal involvement with these denials of surgery to allow Diaz's claims to proceed against them in their individual capacities, particularly as their high-level positions warrant an inference that they established policies that others followed in withholding treatment. *See Antonelli* v. *Sheahan*, 81 F.3d 1422, 1428 (7th Cir. 1996). Furthermore, even if these administrators were not responsible for these alleged policy decisions, they are uniquely situated to indicate who is responsible for the delay in Diaz's treatment. *See Duncan*, 644 F.2d at 655 ("[I]f [defendant] later disclaims knowledge and responsibility for the delay in treatment . . . he can readily identify those who were responsible."). Because Diaz has alleged that Hart, Couture, Ghosh, Puisis, and Funk personally established the policy that led to his not having surgery and their positions of oversight and development of medical practices further strengthen Diaz's claim, the court finds that at this stage Diaz has sufficiently stated a claim against them in their individual capacities.

### C. Dart and McCann

Although the medical supervisors named in this case can be said to have had personal involvement in creating the policies at issue here, the same cannot be said about Dart or McCann. Dart, as sheriff, and McCann, as warden, would not be directly involved or have knowledge of the day to day operations of dispensing medication or overseeing medical policies

such that they can be held personally to have participated in or had knowledge of the decisions that led to the delay in Diaz's medical treatment. *See Duncan*, 644 F.2d at 655. While Diaz relies on *Antonelli*, that case does not support his claims against Dart and McCann as it found that a sheriff and a warden could only "realistically be expected to be personally involved in resolving a situation pertaining to a particular inmate [if] it were of the gravest nature." *Antonelli*, 81 F.3d at 1429-30. Moreover, their presence in this case is not required to determine who denied treatment to Diaz because the medical directors, who remain in the case, are in a better position to do so. *See Duncan*, 644 F.2d at 656. Therefore, the claims against Dart and McCann in their individual capacities will be dismissed.

### III. Official Capacity Claims

Actions against individual defendants in their official capacities are treated as suits against the government entity itself. *Walker* v. *Sheahan*, 526 F.3d 973 977 (7th Cir. 2008). A municipality or local governmental entity cannot be held vicariously liable for the actions of its employees. *Montano* v. *City of Chi.*, 535 F.3d 558, 570 (7th Cir. 2008). An official capacity claim, however, may be based on (1) an express policy that caused a constitutional deprivation when enforced; (2) a widespread practice that was so permanent and well settled as to constitute a custom or usage with the force of law, even though no express municipal policy or law authorized the practice; or (3) a constitutional injury that was caused by an official with final policymaking authority. *McCormick* v. *City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). Additionally, the plaintiff must sufficiently allege that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of the County Comm'rs* v. *Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). A plaintiff is not held to a heightened standard in pleading a *Monell* claim. *McCormick*, 230 F.3d at 323 (citing

*Leatherman* v. *Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d. 517 (1993)).

Defendants argue that Diaz fails to adequately define the custom, policy, or practice at issue and that the factual allegations in the complaint do not meet the pleading requirements set out in *Iqbal*. Post-*Twombly* and *Iqbal*, other courts in this district have continued to apply *Leatherman*'s holding that plaintiffs are not required to plead specific facts to prove the existence of a municipal policy. *Riley* v. *County of Cook*, No. 09 C 2267, 2010 WL 376064, at *4 (N.D. Ill. Jan. 27, 2010); *Jones* v. *Bremen High Sch. Dist*., No. 08 CV 3548, 2009 WL 537073, at *4 (N.D. Ill. Mar. 4, 2009). Although *Twombly* and *Iqbal* require more than boilerplate allegations, Diaz need only allege "enough facts to state a claim to relief that is plausible on its face." *Eckert* v. *City of Chi.*, No. 08 C 7397, 2009 WL 1409707, at *6 (N.D. Ill. May 20, 2009) (quoting *Iqbal*, 129 S. Ct. at 1960). "[A]n official capacity claim can survive even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing." *Riley*, 2010 WL 376064, at *4 (citing *McCormick*, 230 F. 3d at 325). Diaz's allegations regarding a widespread custom are specific enough to alert defendants to the policy he alleges infringes on his constitutional right. Diaz alleges in significant detail that (1) he had an injury that required surgery; (2) he was examined by doctors at the Jail, NRC, and Stroger who said he needed surgery; and (3) no surgery was ever performed. These allegations, which include dates, names of parties, accounts of doctors' visits, and the locations of those visits, are specific enough to put defendants on notice of the policy Diaz is seeking to hold them liable for.

Defendants further claim that a lone decision by Dr. Prieto not to perform unnecessary medical surgery is insufficient evidence of a systemic policy of indifference. *See Sivard* v.

*Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994) (finding that one incident s not enough to establish a widespread custom).  Although defendants cite to Dr. Prieto's deposition as evidence that the surgery was not medically necessary, the court will not consider this argument on a motion to dismiss, not only because is it a matter outside the pleadings, *see* Fed. R. Civ. P. 12 (d), but also because the argument is waived as it was only raised only in reply.  *See Carter* v. *Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004).  If Diaz's allegations are taken as true, surgery for his shoulder is medically necessary, and defendants ignored his serious medical need for months.  Third Am. Compl. ¶¶ 25, 46.  Initially, defendants at the Jail denied him medical treatment for six months by delaying any response to his grievances.  Third Am. Compl. ¶¶ 28-29.  At intake exams at both NRC and the Jail, Diaz was seen by multiple doctors who stated that he needed medical treatment, but no appointment was set for him to receive the proper medical care.  Third Am. Compl. ¶¶ 24, 25, 31.  While detained at the Jail, Sims met with Diaz but failed to schedule surgery or refill his prescription for pain medication.  Third Am. Compl. ¶ 40.  Not until after he filed his complaint and five months from the date of his originally scheduled surgery did Diaz see Dr. Prieto at Stroger on April 15, 2009.  Third Am. Compl. ¶ 42.  A few weeks later, Keen concluded that Diaz had waited too long to have surgery without having personally seen him, despite another physician having determined that same day that Diaz needed surgery.  *Id.* ¶ 43.  Since Diaz has provided examples of more than one instance of delay and denial of medical treatment, *Sivard* does not compel the conclusion that Diaz has not adequately alleged a policy of indifference to medical needs.

Dart, Hart, and Couture also argue that as administrators at the Jail, they could not have anything to do with the policies of physicians at Stroger.  Diaz, however, is not alleging that a policy of indifference existed only at Stroger but, rather, that all the various entities involved all

played a role in determining when pretrial detainees would receive necessary medical attention. Although Diaz's diagnosis can solely be attributed to doctors, the decision as to whether surgery would be performed is not solely in the doctor's discretion and could have been influenced by a common policy existing at Stroger, Cermak, the Jail, and NRC. As Dart, Hart, and Couture could have been involved in setting or allowing such a policy at the Jail and Cermak, their argument is unavailing.

Although the court has found that Diaz has adequately alleged a policy to state claims against defendants in their official capacities, the Eleventh Amendment bars private suits for damages against the state, state agencies, and state officials in their official capacity. *See Joseph* v. *Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005); *Boyd* v. *Walker*, No. 07 C 3448, 2009 WL 35288, at *2 (N.D. Ill. Jan. 5, 2009). Thus, although Diaz cannot recover damages against the defendant state officials in their official capacities, he may still proceed against them for injunctive relief in their official capacities and for monetary damages in their individual capacities. *See Verizon Md. Inc.* v. *Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644-45, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002) (*Ex parte Young* allows defendants to seek prospective injunctive relief from state or state officials).

Ghosh, Funk, Puisis, and McCann argue, however, that prospective injunctive relief is not available against them, as Diaz is no longer in IDOC custody. Injunctive relief may become moot when a prisoner has been transferred to another facility and is not likely to return. *Henderson* v. *Sheahan*, 196 F.3d 839, 849 n.3 (7th Cir. 2000) (finding injunctive relief moot where defendants were no longer plaintiff's custodians and plaintiff was not likely to return to the Cook County jail); *Moore* v. *Thieret,* 862 F.2d 148, 150 (7th Cir.1988) (injunctive relief is moot unless "[plaintiff] can demonstrate that he is likely to be retransferred"). A recent IDOC

inmate search, however, revealed that Diaz is currently housed at Shawnee Correctional Center, an IDOC-managed facility.[8] Thus, Diaz's claims for equitable relief against Dart, Hart, Couture, Keen, Sims, Ghosh, and McCann are moot as Diaz is no longer in Cook County's custody and is not housed at NRC or Stateville. As Diaz remains in IDOC custody, the potential for equitable relief remains against Puisis, IDOC's medical director, and Funk, the Illinois Regional Director for Wexford, IDOC's medical care contractor.

## **CONCLUSION AND ORDER**

For the foregoing reasons, Dart, Hart, Couture, Keen, and Sims's motion to dismiss [#77] is granted in part and denied in part. Puisis and McCann's motion to dismiss [#79] is granted in part and denied in part. Ghosh and Funk's motion to dismiss [#81] is denied. Diaz's claims against Dart and McCann in their individual capacities are dismissed. Diaz's request for equitable relief from Dart, Hart, Couture, Keen, Sims, Ghosh, and McCann is moot. Defendants have fourteen days to answer the remaining claims. At the next status hearing, the parties should be prepared to address Walker and Prieto's status in the case (*see supra* at 1 nn. 2-3).

Dated: March 8, 2010  Entered: *Joan N. Lefkow*

JOAN HUMPHREY LEFKOW
United States District Court Judge

---

[8] This search was performed using the IDOC website's "Inmate Search" feature. *See* Illinois Department of Corrections - Inmate Search, http://www.idoc.state.il.us/subsections/search/default.asp.